IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |
|---|---|
| THE CLEANING AUTHORITY, INC. | * |
| v. | * |
| JOANNA NEUBERT et al. | * CIVIL NO. JKB-10-203<br>CIVIL NO. JKB-09-3447 |
| THE CLEANING AUTHORITY, INC. | * |
| v. | * |
| M. SCOTT ALDRICH et al. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Pending before the Court are similar motions in two related cases. The first case was brought by Plaintiff The Cleaning Authority ("TCA") against Joanna and Frederick Neubert (collectively, the "Neuberts"), for allegedly improper termination of their franchise agreement to operate a residential cleaning business in the Greenville, South Carolina, area. (JKB-10-203 Am. Compl. ¶¶ 15, 38-40, ECF No. 17.) The Neuberts have counterclaimed against TCA and another company, S&T Management, Inc. ("S&T"), for fraud in the inducement, violation of the South Carolina Unfair Trade Practices Act, breach of contract, inducement of breach of contract, and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (2006). (JKB-10-203 Am. Ans. & Countercl., Ex. 1, ECF No. 52.) TCA has filed a motion to dismiss the Neuberts' first and fifth counterclaims. (JKB-10-203 ECF No. 51.)

The second case was brought by TCA against M. Scott Aldrich and Denise Aldrich (collectively, the "Aldriches") for improper termination of the Aldriches' TCA franchise in and around Columbia, South Carolina. (JKB-09-3447 Am. Compl., ECF No. 27.) The Aldriches

likewise counterclaimed against TCA on various grounds, including fraud in the inducement, violation of the South Carolina Unfair Trade Practices Act, breach of contract (mailer services agreement), breach of contract (franchise agreement), tortious interference with contract, and RICO. (JKB-09-3447 Answer & Countercl., ECF No. 40.) TCA has filed a motion to dismiss the first and sixth counterclaims. (JKB-09-3447 ECF No. 47.) The issues have been fully briefed and no hearing is necessary. Local Rule 105.6. The motions will be granted.

## *The Neuberts' Counterclaims*

TCA contends the Neuberts' first and fifth counterclaims should be dismissed for failure to state a claim for relief under Rule 12(b)(6), Federal Rules of Civil Procedure, because the counterclaims lack the specificity required by Rule 9(b). (JKB-10-203 Countercl. Defs.' Mot. Dism. 1, ECF No. 51.) The special pleading requirement of Rule 9(b) mandates particularity of the circumstances constituting fraud. Those circumstances include "'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained.'" *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999) (quoting 5 Charles Alan Wright and Arthur B. Miller, *Federal Practice and Procedure: Civil* § 1297, at 590 (2d ed. 1990)). The particularity requirement applies not only to common-law fraud claims, *D&G Flooring, LLC v. Home Depot U.S.A., Inc.*, 346 F. Supp. 2d 818, 822 (D. Md. 2004), but also to RICO claims predicated on mail or wire fraud, *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477 (D. Md. 2009).

The Court turns initially to the first counterclaim in which the Neuberts allege they were fraudulently induced to enter into their franchise contracts because of misrepresentations and omissions in a document known as a Franchise Offering Circular ("FOC"). They specifically allege the following:

> a) TCA did not disclose the rebates, kickbacks or other payments it receives from S&T Management; to the contrary, TCA represented that except for

  certain sponsorships it did not receive rebates from any approved suppliers;
b) TCA failed to disclose the monies it received from S&T;
c) TCA and S&T falsely represented that, in return for payments by franchisees, S&T would mail the purchased promotional brochures for franchisees;
d) TCA represented to potential franchisees that it would consider alternate suppliers, subject to providing samples, although in fact TCA refused to consider an alternate supplier of promotional brochures for the undisclosed reason that S&T rebated or paid some of the funds it received from TCA franchisees to TCA;
e) TCA provided contact information for terminated franchisees that it knew or had reason to know was not current, thus effectively preventing a prospective franchisee to contact a terminated or non-renewed franchisee.

(JKB-10-203 Am. Ans. & Countercl. ¶ 78.) The FOC has been provided by TCA as an attachment to its reply (ECF No. 60, Ex. D) to the Neuberts' opposition and may be properly considered by the Court in ruling on this motion to dismiss because it is integral to and explicitly relied on in the counterclaim and the counterclaimants do not challenge its authenticity. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

  A bit of background information will help to provide context for the Neuberts' allegations. S&T is an affiliated company to TCA. (JKB-10-203 Am. Compl. ¶ 16.) One of its functions is to send advertising brochures to customers in a franchisee's territory. (*Id.*) At the same time the Neuberts signed the franchise agreement with TCA, they also signed a Mailer Services Agreement with S&T, who agreed to send to customers in the Neuberts' territory an average minimum number of mailers per week. (*Id.*) The Neuberts allege they paid more than $35,000 as an initial franchise fee to TCA, a $2,000 mailer setup fee to S&T, royalties and advertising funds totaling more than $200,000 to TCA, and more than $500,000 to S&T during the time period at issue. (JKB-10-203 Am. Ans. & Countercl. ¶ 77.) They say, if they had "received complete, correct and not misleading information about the franchise opportunity, they would not have purchased the TCA franchise." (*Id.* ¶ 79.)

An essential particularity in a fraud complaint is the time of the claimed misrepresentation. All that the Neuberts allege in their first counterclaim on this point is "in 2004." (*Id.* ¶ 73.) That is insufficient, as is their omission of a place where the claimed misrepresentation occurred, but it may be possible for the Neuberts to amend to provide sufficient particularity. These two deficiencies also plague the Neuberts' fifth counterclaim, that of the RICO violation. *See Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 291 (D. Md. 2003) (RICO complaint not sufficiently particular under Rule 9(b) because it did not include time, place, and contents of false representation, as well as identity of person making representation). In the RICO counterclaim, the Neuberts indicate the FOC was distributed by TCA "beginning prior to 2004 and continuing to the present" and have alleged the same time frame for various other electronic communications and mailings, which the Neuberts contend are "predicate acts" under RICO. (JKB-10-203 Am. Ans. & Countercl. ¶¶ 109, 112.) As TCA points out, this time frame is, taken literally, no time frame at all. (*See* JKB-10-203 Pl.'s Mot. Dismiss Supp. Mem. 9, ECF No. 51.) Although the Neuberts might be able to amend their counterclaims to cure these deficiencies in particularity, the Court must further consider whether the Neuberts have satisfied the pleading standard of Rule 12(b)(6), i.e., whether their first and fifth counterclaims contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 1950. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555.

Comparing the first counterclaim to the elements of common-law fraud leaves the clear impression that this counterclaim falls short of stating a plausible claim for relief. TCA and the Neuberts differ over whether Maryland law or South Carolina law applies to their claim of fraud in the inducement, but neither party argues that the analysis is materially different under either state's law. (*Id.* Supp. Mem. 3; Defs.' Opp. 3, ECF No. 56.) Under Maryland law, one claiming fraud must show

> (1) that defendant made a misrepresentation of a material fact which was false; (2) that its falsity was known to him; (3) that defendant made the misrepresentation for the purpose of defrauding plaintiff; (4) that plaintiff not only relied upon the misrepresentation but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and (5) that plaintiff suffered damage from defendant's misrepresentation. Concealment by defendant of a material fact for the purpose of defrauding plaintiff is also actionable fraud under Maryland law provided that plaintiff suffers damage as a result. However, mere non-disclosure of facts known to defendant without intent to deceive is not fraud and is not actionable under Maryland law unless there exists a separate duty of disclosure to plaintiff by defendant.

*Finch v. Hughes Aircraft Co.*, 469 A.2d 867, 888 (Md. Ct. Spec. App. 1984).

Similarly, the South Carolina courts have enunciated the following standard for fraud:

> "Fraud is an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to her or to surrender a legal right." To prevail on a cause of action for fraud, a Plaintiff must prove by clear, cogent and convincing evidence the following elements:
> > (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.
> To establish a claim or defense of fraud in the inducement, a plaintiff must prove the nine elements of fraud as well as the following three elements: "(1) that the alleged fraudfeasor made a false representation relating to a present or preexisting fact; (2) that the alleged fraudfeasor intended to deceive him; and (3) that he had a right to rely on the representation made to him."

*Moseley v. All Things Possible, Inc.*, 694 S.E.2d 43, 45 (S.C. Ct. App. 2010) (citations omitted).

Since this counterclaim rests on the FOC, it is useful to examine that document to see what it says. On the first page of the preamble to the FOC, it is stated, "You must also pay an

5

affiliate of ours an initial mailer set up fee of $2,000." (JKB-10-203 Defs.' Reply, Ex. D, ECF No. 65.) Then, in Item 1, TCA informs the reader it has two affiliated companies, one of which is S&T Management, Inc. (d/b/a "TCA Advertising" and "TCA Supplies"); "S&T offers direct mail advertising services and may offer cleaning products and supplies to our franchisees." Later, TCA unequivocally states, "You must also use our Affiliate TCA Advertising to provide mailing services and you must pay them a Two Thousand Dollar ($2,000) mailer set-up fee at the time you sign the Franchise Agreement" (Item 5), and "You are required to purchase the direct mail advertising services from our Affiliate. These are the only currently required lease or purchase arrangements from us or our Affiliate" (Item 8).[1] Following those mandates, TCA states, "We also suggest approved suppliers for many of the items you will need to purchase. If you want to purchase products from suppliers other than those we have approved, you must request our approval before doing so." (Item 8.) Then TCA notes that, except for sponsorship by two of its approved suppliers of its annual conventions, "we do not currently receive rebates from any of our approved suppliers." (*Id.*)

The Neuberts allege that TCA, having represented to franchisees it would consider alternate suppliers, refused to consider an alternate supplier of promotional brochures for the undisclosed reason that S&T rebated some of the payments it received from franchisees to TCA. This allegation is implausible because not only did TCA never indicate it would consider an alternate supplier of promotional brochures, but also TCA clearly required its franchisees to purchase advertising services from its affiliate, S&T. Thus, any reasonable reader of the FOC would have understood that he or she had no option when it came to a source for advertising

---

[1] Among the fees a franchisee is expected to pay is a mailing services fee of thirty cents per mailer. (Item 6.)

mailers. As for the Neuberts' allegation that TCA received monies from S&T contrary to its representation in the FOC that it, at that time, did not receive rebates from any of its approved suppliers, the Neuberts have not pleaded sufficient facts to establish the materiality of the financial relationship between TCA and S&T to their decision to purchase a TCA franchise. In a like vein, the Neuberts have failed to allege why they were entitled to disclosure of that information. Moreover, the distinction drawn in the FOC between S&T, as an affiliate from whom franchisees are required to buy advertising services, and "approved suppliers," with whom franchisees may but are not required to do business, further undercuts any notion that the Neuberts were unaware of the business relationship between TCA and S&T or that the representations made about their relationship were false. That disposes of subparts *a*, *b*, and *d* of paragraph 78 in the first counterclaim.

In subpart *c*, the Neuberts allege, "TCA and S&T falsely represented that, in return for payments by franchisees, S&T would mail the purchased promotional brochures for franchisees." The Neuberts offer nothing else to permit an inference that S&T did not mail the promotional brochures. One is left to speculate that S&T did not mail the brochures, but a mere possibility that S&T did not perform as TCA represented it would does not satisfy the pleading standard of Rule 12(b)(6). Even if S&T failed in this regard, nothing in the Neuberts' pleading explains why its failure is not simply a breach of contract rather than fraud.

The remaining allegation of the first counterclaim, subpart *e* – "TCA provided contact information for terminated franchisees that it knew or had reason to know was not current, thus effectively preventing a prospective franchisee to contact [sic] a terminated or non-renewed franchisee" – is also unsupported by specific factual allegations that overcome the reasonable inference that TCA did supply appropriate contact information for its other franchisees, as shown in Exhibit I to the FOC. At the top of the first page of that list of franchisees, it is plainly stated

7

that the list is current as of December 31, 2003. The Neuberts do not say what information in the list was inaccurate. They also do not allege that they tried to contact specific franchisees and were unable to do so, and they do not explain why, if the former is true, contact with those specific franchisees was material to the Neuberts' decision-making. Again, one is left to speculate on the link between the Neuberts' claim of deficient information and their claim of fraud.

As for the RICO counterclaim, it is equally lacking in plausibility. The Neuberts have alleged that the counterclaim-defendants'[2] actions violated 18 U.S.C. § 1962(c), which makes it unlawful

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Racketeering activity," as it is relevant to this case, is defined as any act indictable under 18 U.S.C. §§ 1341 (mail fraud) or 1343 (wire fraud). Mail or wire fraud in the context of this case requires proof of a defendant's knowing participation in a scheme to defraud and the use of the mails or interstate wire facilities in furtherance of the scheme; it is not necessary for such a means of communication or transmission to be an essential element of the scheme. *Proctor*, 645 F. Supp. 2d at 473. "The mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff . . . ." *Id.* However, the misrepresentations must have been material. *Neder v. United States*, 527 U.S. 1, 25 (1999). Any such use of the mails or wires is referred to as a "predicate act." *Park v. Jack's Food Systems, Inc.*, 907 F. Supp. 914, 917 (D. Md. 1995). Finally, the Neuberts must show that the counterclaim-defendants' pattern of racketeering

---

[2] In addition to TCA and S&T, Richard Roes 1-99 are named as counterclaim-defendants in the RICO counterclaim.

activity was the proximate cause of their injury; that is, they must establish that the criminal violation led directly to their injuries. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

For reasons stated earlier, the Neuberts' allegations with respect to the statements or omissions of the FOC were lacking in materiality. That conclusion applies with equal force to their identical allegations in the RICO counterclaim. As well, they fail to allege with requisite specificity whether they received the FOC by mail or by wire. They merely state that TCA provides the FOC "by means of electronic communication and/or through the mails." (JKB-10-203 Am. Answer & Countercl. ¶ 108.) As noted earlier, the particularity requirements of Rule 9(b) apply to the RICO claim; the Neuberts' allegations fail to satisfy this standard.

Besides their allegations about the FOC, the Neuberts have set forth additional, allegedly wrongful actions by the counterclaim-defendants:

    a) Pressuring franchisees to increase the number of promotional brochures for which they would be charged, in excess of that contractually agreed to by the franchisee, using the false rationale that additional brochures would be mailed by S&T, directly benefitting the franchisee, when in fact, TCA and S&T knew that some or all of such funds would be diverted to other uses by TCA;
    b) Causing S&T to refrain from mailing all the promotional brochures it was obligated to mail;
    c) Providing inaccurate and misleading data regarding the cost of promotional brochures on a per customer basis, to artificially inflate the value and performance of the brochures;
    d) Refusing to consider a brochure supplier other than S&T in order to protect its undisclosed rebates or payments from S&T;
    e) Transferring funds from S&T to TCA, and on information and belief, to principals and/or managers of TCA and/or S&T, for purposes outside the scope of the contractual obligations of S&T and TCA;
    f) Concealing this scheme from those the counterclaim defendants defrauded, misled and injured.

(*Id.* ¶ 113.)

These allegations are conclusional in nature and provide insufficient facts to allow the inference that the counterclaim-defendants committed any misconduct. Using terms such as

"pressuring," "causing," "false," "inaccurate," "misleading," "artificially inflate," "refusing," and "concealing" does not counteract the absence of factual allegations that show the Neuberts are "entitled to relief," Rule 8(a)(2). Also, these allegations overlap some of their allegations about the FOC, specifically, those regarding the mailing, or alleged lack of mailing, of brochures, the requirement that franchisees use S&T for advertising services, and the financial relationship between S&T and TCA. For the same reasons those earlier allegations were deemed insufficient, the present ones fail as well.

In conclusion, the motion to dismiss the first and fifth counterclaims will be granted.

*The Aldriches' Counterclaims*

The preceding analysis applies with equal force to the Aldriches' first and sixth counterclaims, which are similar to the Neuberts' first and fifth counterclaims. The Aldriches have added some allegations indicating that the FOC did not comply with a rule of the Federal Trade Commission ("FTC") or with a Maryland regulation. Specifically, they allege that the FOC was deficient because it did not disclose "rebates" or "kickbacks" paid by S&T to TCA; the resulting alleged deficiency violated an FTC rule, and therefore, constituted fraud in the inducement. (JKB-09-3447 Answer & Countercl. ¶¶ 60–67, 72–76, 86, ECF No. 40.)

No dispute seems to exist that, at the time of the Aldriches' decision to become a franchisee of TCA, the Uniform Franchise Offering Circular guidelines, promulgated by the North American Securities Administrators Association, governed the contents of the FOC used by TCA. *See* FTC Statement of Basis and Purpose – 2007, 72 Fed. Reg. 15448 (2007). The UFOC guidelines have one disclosure provision pertinent to the current case. It is Item 8, which provides in part as follows:

> Whether, and if so, the precise basis by which the franchisor or its affiliates will or may derive revenue or other material consideration as a result of required purchases or leases.

10

NASAA, www.nasaa.org/content/Files/UniformFranchiseOfferingCircular.doc (February 7, 2011).

The Aldriches allege that S&T made payments to its affiliate, TCA, and that those payments constituted "rebates" or "kickbacks" that should have been disclosed in the UFOC. Presuming that S&T did make payments of some kind to TCA, the Court concludes that disclosure of such was not required by Item 8. What was required was for TCA to disclose whether it or its affiliate, S&T, "will or may derive revenue" from required purchases. TCA, in fact, did disclose that franchisees were required to purchase advertising services from its affiliate and also disclosed the cost of those advertising services. The obvious implication of that disclosure was that TCA's affiliate, S&T, would derive revenue from those purchases. No further disclosure was necessary. This interpretation is consistent with the Court's earlier conclusion that the disclosure documents drew a distinction between S&T, an affiliate from whom franchisees were required to purchase advertising services, and approved suppliers, from whom franchisees could purchase goods and services. What S&T may or may not have done with the money received from franchisees for advertising services is immaterial. What was material was how much franchisees would have to pay for advertising services, and the Aldriches were fully informed of that.

The correctness of this conclusion is buttressed by reference to the Federal Trade Commission's Statement of Basis and Purpose Relating to Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures. The Aldriches cite the 1978 version of this statement in their counterclaim (JKB-09-3447 Answer & Countercl. ¶¶ 61-66, ECF No. 40), but omit pertinent language:

> The Commission has determined on the basis of comments on the public record that "rebate" information is "material" to a prospective franchisee since it permits the prospective franchisee to determine how much of what he or she is

11

paying for goods or services which the franchisor requires or advises him or her to buy actually goes toward the purchase of such goods, and what portion of the purchase price is being rebated to the franchisor **or affiliated person**.

43 Fed. Reg. 59657-58 (emphasis added).

In accord with the alignment of "affiliated person" with the franchisor, the FTC also stated:

> . . . [T]he disclosure requirements of section 436.1(a)(11) of the rule provide for a description of the basis for calculating, and, if such information is readily available, the actual amount of any revenue or other consideration to be received by the franchisor, **or persons affiliated with the franchisor, from suppliers** to the prospective franchisee in consideration for goods or services which the franchisor requires or suggests that the franchisee obtain from such suppliers.

43 Fed. Reg. 59658 (emphasis added).

Additionally, the FTC stated:

[M]ost important, the disclosure as to "rebate" information is required of a franchisor only where (a) the supplier or suppliers in question are "required" or "advised" sources of franchisee purchases, and (b) the rebate in question is received by the **franchisor or affiliated person** in consideration for such "required" or "advised" franchisee purchases.

43 Fed. Reg. 59659 (emphasis added).

Finally, the FTC advised:

> . . . [T]he term "rebate" is intended to refer to any revenue or other consideration received by a **franchisor or "affiliated person" from a supplier** to franchisees, involving the operation of the franchise business. Therefore, the term "rebate" includes such sources of revenue or consideration as volume discounts, trade discounts, and advertising allowances, as well as commissions, "kickbacks" and other fees passed from such a **supplier to a franchisor or "affiliated persons."**

43 Fed. Reg. 59657 n.217 (emphasis added).

Consequently, this statement of the FTC contradicts the Aldriches' counterclaim of fraud in the inducement because their counterclaim rests on the assumption that S&T should be regarded the same as an unaffiliated supplier. In fact, S&T was affiliated with TCA and the FOC

12

fully disclosed that relationship. The FTC statement makes a clear distinction between "affiliated persons" and "suppliers" and thereby exposes the fallacy of the Aldriches' theory.

As for their RICO counterclaim, not only is it lacking in particularity, but it rests on the same deficient grounds as did the Neuberts' RICO counterclaim. The Aldriches cite a Maryland regulation for the proposition that, if a franchisee is required to purchase goods or services from a franchisor-designated source affiliated with the franchisor, then the franchisor must disclose the cost to the vendor of the goods or services. Md. Code Regs. 02.02.02.08.21(J)(2)(b) (2011). This regulation does not seem to apply to the Aldriches since it only applies "to any offer to sell or sale of a franchise in the State." Md. Code Regs. 02.02.02.08.21(A) (2011). The Aldriches' franchise is not in Maryland, but in South Carolina. Their first and sixth counterclaims will be dismissed for failure to state a claim.

### *Leave to Amend*

Both the Neuberts and the Aldriches have requested leave to amend their counterclaims if they were found deficient. (JKB-10-203 Opp. Mem. at 1, 10; JKB-09-3447 Opp. Mem. at 2 n.2.) The Aldriches did not provide specific factual allegations or a proposed amended counterclaim that cure the deficiencies found by the Court. The Neuberts submitted an affidavit by Joanna Neubert that apparently is supposed to be considered by the Court in evaluating their request for leave to amend. (Joanna Neubert Aff., ECF No. 57.) However, even those additional allegations are insufficient to overcome the deficiencies of their counterclaims. Accordingly, leave to amend will be denied in both cases. Plaintiff's motion to strike the affidavit of Joanna Neubert

will be denied. Defendants' requests to have additional discovery time, based upon the counts to be dismissed, will be denied.

Dated:    February 11, 2011           /s/
                                                               James K. Bredar
                                                                United States District Judge